IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 24, 2018

**JAMES ALLEN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Washington County**
**No. 41230     Lisa Rice, Judge**

---

**No. E2017-01043-CCA-R3-PC**

---

The petitioner, James Allen, appeals the denial of post-conviction relief from his 2013 Washington County Criminal Court jury convictions of first degree murder and possession of a firearm with intent to employ it during the commission of first degree murder, for which he received a life sentence.  In this appeal, the petitioner contends only that he was denied the effective assistance of counsel at trial.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Casey A. Sears, II, Johnson City, Tennessee, for the appellant, James Allen.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Tony Clark, District Attorney General; and Erin McArdle, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Washington County Grand Jury charged the petitioner with one count each of first degree premeditated murder, possession of a firearm with the intent to employ it during the commission of a first degree murder, and an order of protection violation.  Prior to trial, the trial court dismissed the order of protection violation charge, and following a jury trial, the petitioner was convicted as charged of first degree murder and the unlawful possession of a firearm.  The trial court imposed a sentence of life imprisonment.  This court affirmed the convictions and sentences on direct appeal.  *See State v. James Henry Allen*, No. E2014-00529-CCA-R3-CD (Tenn. Crim. App., Knoxville, Jan. 23, 2015), *perm. app. denied* (Tenn. Aug. 13, 2015).

The evidence adduced at the petitioner's trial established that the petitioner and Deborah Kay Franklin Keplinger divorced in 1994 after more than nine years of marriage, but despite their divorce, the couple continued to occasionally live together during their off-and-on relationship. *Id.*, slip op. at 2. In December 2009, during a time in which she was not seeing the petitioner, Mrs. Keplinger began dating the victim, Richard Carter. *Id.* Although Mrs. Keplinger did not inform the petitioner of her relationship with the victim, the petitioner eventually discovered it and "expressed his disapproval" about the relationship to one of his and Mrs. Keplinger's daughters. *Id.* After enduring numerous disparaging comments and threatening text messages from the petitioner, Mrs. Keplinger obtained an order of protection against him, although the text messages continued. *Id.* The petitioner would also send messages to Mrs. Keplinger through their daughter and would yell at Mrs. Keplinger while standing across the street from her residence. *Id.* Mrs. Keplinger reported this behavior to the police on several occasions, eventually resulting in the petitioner's arrest in March 2010 for violating the order of protection. *Id.*, slip op. at 2, 3. Following his arrest, the petitioner continued to threaten Mrs. Keplinger, telling their daughter "that he 'was going to kill [Mrs. Keplinger] and [the victim].'" *Id.*, slip op. at 3.

At some point, the victim began living with Mrs. Keplinger in the same residence where she and the petitioner had lived during their marriage. *Id.* On the night of May 10, 2010, Mrs. Keplinger and the victim were at home when she heard her dogs barking sometime after 9:30 p.m. *Id.* When Mrs. Keplinger stepped outside to investigate, she noticed that the front porch light did not illuminate. *Id.* Mrs. Keplinger returned inside and asked the victim to look at the light, knowing that the light bulb had recently been replaced. *Id.* The victim stepped outside to examine the light fixture and confirmed that the light bulb was missing. *Id.* While Mrs. Keplinger walked to the kitchen to retrieve a new light bulb, the victim closed the front door and looked through the diamond-shaped window in the door. *Id.* Mrs. Keplinger then heard four or five gunshots, and she ran to the front door. *Id.*, slip op. at 4. The glass in the door had been shattered, and the victim, stating that he had been shot, collapsed onto the floor. *Id.* Mrs. Keplinger called 9-1-1 and repeatedly told the dispatcher that the petitioner was likely the shooter. *Id.*, slip op. at 5. The victim was transported to the hospital but succumbed to his wounds, which included three gunshot wounds to the chest area. *Id.*, slip op. at 4, 5.

Following his arrest, the petitioner gave a statement to police officers, which statement was admitted into evidence at trial and included the following:

> After being with [Mrs. Keplinger] for 26 years and seeing [the victim] hug her was making me angry. I felt like I had lost my second family at this point. It made me snap. It was

like a dream. I went up to th[e] house to the right of the mobile home and got a rifle that was hid in the house after I saw them hugging in the window. I went and was petting my dog. I didn't want to be seen so I unscrewed the light bulb and put it in my pocket. I went back to petting my dog and Peaches the inside dog started barking and [Mrs. Keplinger] came to the door and let the dog out and said something about the light not working. She shut the door and [the victim] came to the door and put his face in the window. My son and daughter had told me that [the victim] had been carrying a gun. I shot a warning shot or 2 in the air. In the door window it looked as if [the victim] was pulling a gun up and I shot a few shots through the door to scare him. I started walking down Cherry Lane towards [H]ighway 93. I crossed 93 and across the bridge behind the barn. I passed out for about an hour because I was tired. After I woke up I thought that I had dreamed it all. I got a phone call from Jerry Arnold my nephew and he said that [the victim] had got shot and I saw a rifle lying there and I figured it was true. I walked into the woods and set up some snares. I shot me a rabbit to eat and went to sleep. I had planned to stay in the woods a couple of days to mellow me out. I hadn't been over there in 6 weeks. I don't know why I went over there. As I walked up Cherry Lane initially, I could see through the rear sliding door where the pool table was and I could see them hugging. That really made me snap. After spending the night in the woods my daughter called me and I didn't know if I had dreamed it and she told me that [the victim] was dead. I told her that I wanted to turn myself into the Sheriff's office because I was sick and needed help. The next call came from the S[ergeant] with the Sheriff's office wanting to meet me. I arranged to meet them, and they showed up. My sugar is up and down and messing with me. I believe that[']s why I was there.

*Id.*, slip op. at 7-8.

The petitioner's daughter, Jamie Allen, testified on his behalf and denied ever hearing the petitioner threaten to kill Mrs. Keplinger or the victim. *Id.*, slip op. at 9. When Ms. Allen spoke with the petitioner on the night of the shooting, she believed that he sounded "'confused'" and that he "was 'speaking slower than normal.'" *Id.*

- 3 -

On January 12, 2016, the petitioner filed, pro se, a timely petition for post-conviction relief, alleging, *inter alia*, that he was deprived of the effective assistance of trial counsel. Following the appointment of counsel, the post-conviction court conducted an evidentiary hearing on February 21, 2017.

At the evidentiary hearing, the petitioner stated that both lead trial counsel and assistant trial counsel had been appointed to represent him. Prior to trial, the petitioner asked counsel to subpoena four witnesses – his sister, an Eastman Credit Union employee, Tom Blair, and Dawn Blair – who could testify that Mrs. Keplinger had been stalking him and that he had not been stalking Mrs. Keplinger, but counsel failed to call any of the witnesses at trial or to obtain requested security camera footage from the credit union. The petitioner also asked lead counsel to use cellular telephone records in his cross-examination of the petitioner's daughter, Leslie Nielsen, to disprove allegations that he had stalked Mrs. Keplinger, but counsel failed to follow this line of questioning with Ms. Nielsen.

The petitioner testified that he had also asked lead counsel to cross-examine Mrs. Keplinger regarding how she had developed her belief that the petitioner was stalking her, whether she had any witnesses to the alleged stalking, and "why she was lying" about the stalking but that counsel had failed to ask any of those questions.

Lead counsel testified that he had practiced law for almost 20 years and that his practice had been devoted to criminal law for nearly 17 years. Lead counsel and assistant counsel were appointed to represent the petitioner, and lead counsel testified that he met with the petitioner "quite a few times" prior to trial. Lead counsel recalled that the petitioner wished "to go into other matters in the history of his relationship with" Mrs. Keplinger but that counsel had "dismiss[ed] those notions" because he did not believe it would have assisted the petitioner in his defense. With respect to the witnesses the petitioner asked him to subpoena, lead counsel spoke with each of them and determined that their testimony would not be helpful to the petitioner, and lead counsel explained this to the petitioner. With respect to the cross-examination of Ms. Nielsen, lead counsel had no independent recollection of cellular telephone records, but he did reiterate that he did not "think it was in [the petitioner's] best defense to discuss prior allegations" of stalking.

Assistant counsel testified that he had practiced criminal law for over 26 years and had tried several prior first degree murder cases. Assistant counsel met with the petitioner on several occasions, but he recalled that lead counsel met with the petitioner more often. Assistant counsel's primary role in the petitioner's case was the "mental side" of the petitioner's case: arranging an expert psychiatric evaluation of the petitioner and reviewing all of the petitioner's psychiatric and military records. Assistant counsel agreed that the petitioner was found competent to stand trial. With respect to the

petitioner's claims that defense counsel had failed to call or question witnesses regarding stalking allegations, assistant counsel agreed that he and lead counsel had successfully excluded from trial any reference to Mrs. Keplinger's order of protection against the petitioner. Assistant counsel also acknowledged that, had the defense addressed the stalking issues at trial, it likely would have opened the door to the State's entering into evidence the order of protection which the defense had successfully fought to exclude.

With this evidence, the post-conviction court denied relief, finding no clear and convincing evidence that lead counsel or assistant counsel had rendered ineffective assistance of counsel. To the contrary, the court found that "the evidence is substantial and overwhelming that trial counsel reviewed the options available to [p]etitioner, explored discovery and met with their client regularly and discussed trial decisions." In its detailed order denying relief, the court found that the petitioner failed to present any witnesses or the alleged security camera footage, all of which the petitioner claimed would have assisted in exonerating him:

> During the evidentiary hearing, [p]etitioner presented no witnesses nor the alleged video surveillance itself to establish that the evidence, if it in fact existed, and that its presentation to the jury would have made a difference in the ultimate verdict reached by the jury. Failure to present evidence concerning an allegation made in the request for relief results in a waiver of that issue. . . .

> Therefore, this ground for post-conviction relief is dismissed.

> . . . .

> The Post Conviction Court cannot speculate, guess or assume what the testimony of any witness would be or if it would even be favorable to [p]etitioner, nor what evidence, if any, further investigation of the witness would uncover. Furthermore, [lead counsel] testified that he and [p]etitioner discussed the potential use of these witnesses and the fact that they offered little if anything to assist in his defense.

> This Court further FINDS that [lead] counsel's decisions regarding the potential testimony of [these witnesses] at trial were informed and resulted from adequate preparation and analysis of the benefits versus the possible

- 5 -

drawbacks of their testimony. This Court credits the testimony of [lead counsel] regarding these discussions during trial preparation.

The Court FINDS that this was a trial strategy developed by counsel, after consultation with his client that will not be guessed with the benefit of hindsight. . . .

Petitioner has failed to present the required proof to substantiate the basis for these grounds alleging ineffective assistance of counsel. Therefore, the burden of proof has not been met on this issue and these claims are dismissed.

In this appeal, the petitioner reiterates his claim of ineffective assistance of counsel, claiming that trial counsel performed deficiently by failing to use the security camera footage and the requested witnesses to prove the petitioner's theory that he had been stalked and thus acted in self-defense. The State contends that the court did not err by denying relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record fully supports the denial of relief in this case. The petitioner acknowledges that "[t]here was no deficiency of representation in the investigative or trial phases of this case" and that counsel's "tactical and strategic decisions were soundly made based upon the facts available to the defense team at the time the decisions were made." The petitioner's sole complaint is that trial counsel failed to follow the petitioner's requested theory of defense by calling certain witnesses and producing certain video surveillance footage. The petitioner failed to present these witnesses or the alleged video recording at the evidentiary hearing. In consequence, we cannot speculate as to the content of the potential testimony or recording. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Furthermore, trial counsel's reasoning for not pursuing this theory of defense – that testimony regarding stalking would have been detrimental to the petitioner's case and would have potentially opened the door to evidence of Mrs. Keplinger's order of

protection against the petitioner – was a "reasonably based trial strategy" that we will not "second-guess." *See Adkins*, 911 S.W.2d at 347. Moreover, the post-conviction court accredited lead counsel's testimony that he discussed with the petitioner the drawbacks of having these witnesses testify. Given the overwhelming evidence against the petitioner, he cannot establish that, but for counsel's alleged errors, the outcome would have differed. *See Strickland*, 466 U.S. at 694. As such, we hold the petitioner has failed to prove by clear and convincing evidence any facts that demonstrate that trial counsel's representation was deficient or prejudicial.

The petitioner failed to establish that he was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE